UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ANNAMALAI ANNAMALAI,

        Plaintiff,

    v.

UNITED STATES OF AMERICA,

        Defendant.

Case No. 22-cv-01541-JPG

**MEMORANDUM AND ORDER**

This case is before the Court on Defendant United States of America's Motions for Summary Judgment (Doc. 136; Doc. 142). The first motion (Doc. 136) asks the Court to grant summary judgment on Plaintiff's medical malpractice claim. Plaintiff filed a response to the motion (Doc. 140). The second motion asks the Court to grant summary judgment on all four of Plaintiff's claims. Plaintiff filed a response to the motion (Doc. 151), and the United States filed a reply (Doc. 154).

I. **BACKGROUND**

A. Complaint and Screening Order:

On July 15, 2022, Plaintiff filed a Complaint that brought nineteen claims against twenty-one defendants for events that arose at different prison facilities over the course of seven years. The Court determined that Plaintiff's claims arise from five separate transactions or occurrences. As such, it entered a Severance Order on November 4, 2022, that severed the case into four new suits. The plaintiff's core claims, which arise from Plaintiff being attacked by Inmate William A. White ("Inmate White"), remained in this case.

Three days later, on November 7, 2022, the Court entered a Screening Order under 28 U.S.C. § 1915A. Pursuant to that order, the following claims proceeded against the United

States:

| | | |
|---|---|---|
| Count 3: | FTCA claim against the United States for failing to protect Plaintiff from the serious risk of harm White posed to his health or safety in USP-Marion's CMU/CTU in October 2021 | |
| Count 7b: | FTCA claim against the United States based on Moulton, Pass, and Does 1-10's deliberate disregard of Plaintiff's medical and mental health needs following his assault by White in October 2021 | |
| Count 9: | FTCA claim against United States for FBOP officials' intentional infliction of emotional distress on Plaintiff | |
| Count 10: | FTCA claim against United States for FBOP officials' negligent infliction of emotional distress on Plaintiff | |

B.  <u>Initial Conviction and Sentencing:</u>

In 2013, a jury found Plaintiff guilty of fraud in connection with his operation of a Hindu temple. In July 2015, he received a sentence of twenty-seven years. Following his sentencing, Plaintiff was remanded to the custody of the Federal Bureau of Prisons ("BOP"). His Judgment and Conviction Order contained special directives for his confinement, including a communication restriction as follows:

> The Court orders that, while in Bureau of Prisons custody, the defendant shall have no phone privileges, save the phone privilege to speak with attorneys that represent him in legal actions or court-appointed stand-by legal counsel. This order prohibits the defendant's participation in any type of phone call – whether by three-way call, conference call, or other means – with any individual other than attorneys that represent him or his standby counsel.

The BOP, at various times, housed Plaintiff in the communications management units ("CMUs") at FCI Terre Haute, Indiana and USP Marion, Illinois ("Marion CMU"). CMUs were created to "house inmates who, due to their current offense of conviction, offense conduct, activity while incarcerated, or other verified information, require increased monitoring of communication between the inmate and persons in the community to protect the safety, security,

and orderly operation of the BOP or to protect the public." U.S. DEP'T OF JUST., FED. BUREAU OF PRISONS, LEGAL RESOURCE GUIDE TO THE FEDERAL BUREAU OF PRISONS 18–19 (2019).[1] They house inmates who "have been convicted of a terrorism-related offense, associated with a terrorist organization, repeatedly attempted to contact their victim(s), or attempted illegal activities through approved communication methods or received multiple incident reports due to misuse of such communication methods." *Id.* It "is a general population unit, with access to customary inmate activities, such as recreation, religious services, and education programming." *Id.* There is an extensive process the BOP uses to designate inmates to the CMU. The BOP chose to place Plaintiff in the CMU based on his offense of conviction and the substantial likelihood that he would engage in furtherance of illegal activity through communication with persons in the community, a conclusion that there was a substantial likelihood that he would contact victims of the offense of conviction, and his history of abusing approved communication methods while incarcerated.

    C.   <u>Appeal and Re-Sentencing:</u>

On September 24, 2019, the Eleventh Circuit entered an opinion in Plaintiff's direct appeal that reversed twenty-two of the thirty-four counts of conviction and remanded for resentencing. Prior to resentencing, Plaintiff wrote letters to BOP's Computation and Designation Center, the United States Marshal's Service, Case Manager Gary Burgess, Intelligence Research Specialist Kathy Hill, the Warden of USP Marion, the Warden of FCI Terre Haute, and BOP Attorney Katherine Siereveld expressing concerns about being returned to the Marion CMU. He also filed a written allocation in his criminal case expressing fear of the

---

[1] https://www.bop.gov/resources/pdfs/legal_guide_march_2019.pdf

"radicalized terrorists" housed in the CMU.

Plaintiff was resentenced on August 27, 2021, and received an eighteen-year sentence. The Amended Judgment and Conviction Order recommended that Plaintiff not be housed in the CMU but maintained that his communications should be limited. Specifically, it ordered that, while Plaintiff is in BOP custody, he "shall only have phone privileges to communicate with his family, counsel, and medical care providers." After the resentencing hearing, Plaintiff expressed additional concerns about returning to the Marion CMU because he did not want to be housed with terrorists.

Despite Plaintiff's concerns, the BOP returned him to the Marion CMU. It chose to return him there because, when an inmate is moved out of a facility on a writ, the policy of the BOP is to return that inmate to that same institution upon completion of the writ. Plaintiff arrived back at Marion CMU on October 1, 2021. He remained in a segregation unit of the CMU in a single-man cell until October 5, 2021, due to a need to verify his COVID vaccination. On October 5, 2021, Plaintiff returned to the general population of the CMU. He alleges that, upon his return to the general population, he made numerous oral complaints to prison officials stating that he was fearful for his life.[2] In addition, he wrote and signed a letter, dated October 10, 2021, to Dr. Annabell Fields detailing the harassment and threats he was receiving from inmates in the CMU. The United States disputes that Plaintiff transmitted the letter to Dr. Fields.

D.  Attack by Inmate White

On October 13, 2021, Plaintiff was housed in the D range of the Marion CMU. Inmate

---

[2] The Court notes that the only evidence of many of these alleged oral complaints is Plaintiff's unsworn statements in his unverified complaint. Any disputed facts raised by Plaintiff that can only be supported by Plaintiff's unverified complaint have not been considered in the Court's analysis.

White was housed in the C range of the unit. At around 8:00 pm, Plaintiff went to the C range to meet with an inmate who went by the nickname of "Shawn" to watch the television show "Sistas" on BET. While Plaintiff was in the C range, he was involved in an altercation involving Inmate White. The altercation was captured on video. It began by Inmate White walking past the table where Plaintiff was sitting and making hateful religious remarks towards him. Plaintiff continued to watch the television and did not respond to Inmate White's comments. Despite Plaintiff remaining calm and attempting not to escalate the situation, Inmate White walked up to where Plaintiff was seated and hit him from behind. Plaintiff fell to the floor, and Inmate White struck him approximately twelve times with his hand. The parties dispute whether Inmate White choked Plaintiff. During the altercation, Plaintiff attempted to defend himself by striking Inmate White with scissors that Plaintiff retrieved from his pocket. The altercation lasted between 1 minute and 15 seconds and 1 minute and 30 seconds[3] until it was broken up by correctional officers.

Plaintiff did not receive medical treatment on the day of the altercation. He was placed in a segregation cell overnight. The following morning, at 6:41 am, Registered Nurse Andrew Moulton examined Plaintiff for physical injuries. During the examination, Plaintiff reported pain in his head, mouth, and chest. Nurse Moulton recorded that Plaintiff had an abrasion just above his left ear with no bleeding and had several areas of minimal edema to the back of the head with no bruising. He indicated that Plaintiff's back tooth on the right top was chipped. No other injuries were identified. Dr. Randall Pass looked at the injuries documented by Nurse Moulton and opined that the injuries were minor, did not require further examination by a mid-level

---

[3] The parties disagree on the length of the altercation.

provider or physician, and did not warrant medical observation. A few months later, on January 5, 2022, Plaintiff complained of a broken tooth. He received a dental examination on January 18, 2022, and fractures were found in three of his teeth. Slight sensitivity was noted and it was documented there was no pain. The dentist provided temporary bonding on one of the teeth to assist in preventing food impaction.

 E. Plaintiff's Placement in the Special Housing Unit ("SHU"):

  After the altercation, Plaintiff was held in a segregation unit and then placed in the SHU until November 29, 2021. Disciplinary proceedings were pending against both Inmate White and Plaintiff. The duration of the SHU placement related to the need for an investigation, the service of incident reports on both inmates, and the need to hold a hearing before a disciplinary hearing officer. While in the SHU, Plaintiff and Inmate White were kept in separate cells with at least one empty cell between them. For around fifty days, Inmate White constantly harassed and threatened Plaintiff. In addition, he repeatedly threatened to kill Plaintiff's wife and children through members of his organization outside of the prison. Plaintiff sent numerous letters to prison personnel regarding the daily threats and harassment, and their negative effect on his mental health. One of those letters stated that his mental state had deteriorated to the point that he believed suicide was the only option. He also reported experiencing flashbacks, nightmares, and anxiety.[4]

## II. LEGAL STANDARDS

---

[4] Plaintiff alleges that he suffered from PTSD, that manifested as a variety of symptoms including loss of sleep, anxiety, depression, dangerously elevated A1C levels, loss of forty-four pounds, constant fear, flashbacks and nightmares, and a rise in blood pressure to the point he feared he would have a heart attack or stroke. However, since most of these allegations are only supported by Plaintiff's unverified complaint, the Court has only discussed the symptoms that are substantiated by Plaintiff's medical records.

A.  Summary Judgment Standard:

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014) (citing FED. R. CIV. P. 56(a)); *accord Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Bunn v. Khoury Enters., Inc.*, 753 F.3d 676, 681–82 (7th Cir. 2014).

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 900 (7th Cir. 2011). As the Seventh Circuit has explained, "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S at 247–48. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

B.  <u>Federal Tort Claims Act:</u>

The Federal Tort Claims Act ("FTCA") is a limited waiver of the Government's

sovereign immunity. *See* 28 U.S.C. § 1346(b)(1). It gives federal courts

> exclusive jurisdiction of civil actions on claims against the United States, for
> money damages . . . for . . . personal injury or death caused by the negligent or
> wrongful act or omission of any employee of the Government while acting within
> the scope of his office or employment, under circumstances where the United
> States, if a private person, would be liable to the claimant in accordance with the
> law of the place where the act or omission occurred.

*Id*. The FTCA allows the United States to be held liable for tort claims "in the same manner and

to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674; *see*

*United States v. Muniz*, 374 U.S. 150, 153 (1963); *Augustis v. United States*, 732 F.3d 749, 752

(7th Cir. 2013), *cert. denied*, 135 S. Ct. 53 (2014). To determine how a private individual would

be treated, the Court must apply the substantive law of the state where the act or omission

occurred. *FDIC v. Meyer*, 510 U.S. 471, 478 (1994); *Augustis*, 732 F.3d at 752. The acts or

omissions alleged in this case occurred at USP-Marion, so Illinois substantive law applies.

C.  <u>Discretionary Function Limitation:</u>

Congress crafted several exceptions to § 1346(b)(1)'s waiver of immunity. 28 U.S.C. §

2680; *see, e.g.*, *Smith v. United States*, 507 U.S. 197, 199 (1993) (no jurisdiction over claims

arising in a foreign country), *Rothrock v. United States*, 62 F.3d 196, 197 (7th Cir. 1995) (no

jurisdiction over cases involving discretionary function). One such exception is for claims arising

from government acts and decisions that are based on considerations of public policy. *See United*

*States v. Gaubert*, 499 U.S. 315, 322–23 (1991). This so-called "discretionary function

exception" provides that the United States has not waived its sovereign immunity for

> [a]ny claim based upon an act or omission of an employee of the Government,
> exercising due care, in the execution of a statute or regulation, whether or not such

8

statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). To fall within the discretionary function exception, the acts giving rise to the suit must meet two requirements: (1) the acts must be discretionary in nature in that they involve an element of judgment or choice, and (2) the judgment exercised in the act must be the type of judgment that the discretionary function exception was designed to shield. *Gaubert*, 499 U.S. at 322–23 (citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984)).

To determine whether an act is discretionary because it involves an element of judgment or choice, the Court must examine the nature of the act, not the status of the actor. *Gaubert*, 499 U.S. at 322. For example, although it is common for high-level government workers to exercise judgment or choice in making planning-level decisions to advance policy goals, it is possible that a low-level employee may also be charged with making the same types of judgment calls. *See Varig Airlines*, 467 U.S. at 820. By the same token, the conduct of high-level government employees may be prescribed by statute, regulation or policy such that any element of judgment or choice is absent. *Gaubert*, 499 U.S. at 322. A government employee does not exercise discretion when statutes, regulations, or policies dictate his or her conduct. In that case, the employee has no rightful option but to conform his or her conduct to the rule, and there is no room for judgment or choice. *Id.*

Even if an act is discretionary because it involves an element of judgment or choice, the discretionary function exception will not apply unless the judgment exercised was the type that the exception was designed to shield from liability. *Id*. at 322–23. The exception was designed to

"'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 323 (quoting *Varig Airlines*, 467 U.S. at 814). Thus, for the discretionary function exception to apply, the judgment exercised must be based on considerations of public policy. *Gaubert*, 499 U.S. at 323. For example, a judgment call made when driving a vehicle in the course of government employment is a discretionary decision but is not based on considerations of public policy. *Id.* at 325 n.7. Thus, tort claims arising from such conduct do fall under the discretionary function exception. *Id.*

## III.    <u>ANALYSIS</u>

### A.  <u>Count 3 – Failure to Protect:</u>

Under Illinois law, a private person would be liable for negligence if the plaintiff establishes "that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach proximately caused injury to the plaintiff." *Choate v. Indiana Harbor Belt R.R. Co.*, 980 N.E.2d 58, 64 (Ill. 2012). Prison officials have a statutory duty to "provide suitable quarters and provide for the safekeeping, care, and subsistence" and "the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2) & (3); *see also Palay v. United States*, 349 F.3d 418, 428 (7th Cir. 2003). In determining if a specific duty exists, the primary consideration is whether the harm was reasonably foreseeable. *Popp v. Cash Station, Inc.*, 613 N.E.3d 1150, 1153 (Ill. App. Ct. 1992).

"A criminal attack by a third person is reasonably foreseeable when the circumstances are such as to put a reasonably prudent person on notice of the probability of an attack or when a serious physical altercation has already begun." *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143,

10

1148 (7th Cir. 2010). Even if the attack is foreseeable, "courts must still decide whether to impute a duty to protect against the attack." *Id.* There are several factors relevant to determining whether to impose a duty to protect, including: "(1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant." *Id.* (quoting *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1057 (7th Cir. 2010)).

Proximate cause is made up of "two distinct requirements: cause in fact and legal cause." *Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992). Cause in fact exists when "there is a reasonable certainty that a defendant's acts caused the injury or damage" and the defendant's conduct "was a material element and a substantial factor in bringing about the injury." *Id.* Legal cause is established if the injury is foreseeable, or more specifically, it "is of a type which a reasonable man would see as a likely result of his conduct." *Id.* at 503.

The Court finds that a genuine dispute of material fact exists as to whether the United States owed a duty to protect Plaintiff from Inmate White. A prisoner can prove an attack was reasonably foreseeable "by showing that he complained to prison officials about a specific threat to his safety." *Jackson v. Frank*, No. 20-cv-035-DWD, 2023 WL 6311517, at *3 (S.D. Ill. Sept. 28, 2023) (quoting *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015) (internal citations omitted)). Generalized and vague complaints are insufficient. *Id.* The complaint "must identify the potential assailant and describe 'a specific, credible and imminent risk of serious harm.'" *Id.* On October 10, 2021, three days before the attack, Plaintiff drafted and signed a letter addressed to Dr. Fields, the chief psychologist at USP-Marion.[5] In the letter, Plaintiff complained of

---

[5] Plaintiff's citation for this letter is to an exhibit attached to his unverified complaint. However, the Court has considered the letter in its analysis because Plaintiff testified, while under oath at his deposition, that he wrote the

"emotional tortures, harassments, intimidations or otherwise assault(s)." He listed ten inmates that were involved. The first name on the list is "William A. White." The letter detailed two interactions Plaintiff had with Inmate White. They occurred on October 9, 2021, and October 10, 2021. In both interactions, Inmate White made racial and anti-Hindu remarks to Plaintiff. In addition, the letter expressed Plaintiff's fear of being attacked by Inmate White. It specifically states:

> I am IN CONSTANT FEAR FOR MY LIFE, SAFETY AND SECURITY. NOTABLY, I do not want to die by the hands of a radicalized [M]uslim terrorists or by "WHITE SUPREMACIST" leaders like Mr. William A. White, who is presently housed with me, who on a day to day basis causing extreme "emotional [tortures]." Also he is "instigating" "religious hates" between myself and other radicalized Muslim terrorists held here. The same man, in year 2016, over an issue with the typewriter has paid a "coffee [p]ack," to a Muslim terrorist known as "Michael Disch (now he is housed at Terre Haute-Indiana terrorist unit) and caused [him] to assault [me]. This man has a vast history of "threats[,]" murder attempts, harassments of public, judges, court personnels and etc.

The United States disputes that Plaintiff transmitted the letter to Dr. Fields. However, it argues that its dispute is immaterial because the content of the letter does not report an imminent threat posed by Inmate White. The Court disagrees. In the letter, Plaintiff explains the harassment he has received from Inmate White, indicates he is scared that Inmate White will kill him, and details an attack he suffered that was instigated by Inmate White. The letter is a specific complaint, it identifies a potential assailant, and it describes a specific, credible and imminent risk of serious harm. Therefore, whether the letter was delivered to Dr. Fields is a genuine issue of material fact, and the United States has not shown that it is entitled to summary judgment.

In addition, there is a genuine issue of material fact as to whether Plaintiff had reasonable protection from Inmate White. The United States argues that Plaintiff had reasonable protection

---

letter.

from Inmate White because he could have avoided going into the C range and sitting near Inmate White's cell. It also argues that, between Inmate White's initial harassment and the attack, Plaintiff had an opportunity to leave cell block C and return to his own cell. The Court is not satisfied by these arguments. Even though Plaintiff had an opportunity to leave cell block C before the attack, there is no evidence that shows Inmate White could not have followed Plaintiff back to his cell. Further, there is evidence that Inmate White harassed and threatened Plaintiff in the common areas of the prison. Even if Plaintiff walked away on October 13, 2021, Inmate White still would have posed a threat to him and his safety in all areas of the Marion CMU. Therefore, the fact that Plaintiff could have walked away is not sufficient to show that he had reasonable protection from Inmate White. Since there is a genuine issue of material fact as to whether Plaintiff had reasonable protection, the United States has not shown that it is entitled to summary judgment.

The discretionary function exception does not apply to Plaintiff's failure to protect claim. "To support summary judgment under the exception, the government must offer evidence that shows beyond reasonable dispute that its conduct is shielded by the exception." *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014). The Court recognizes that the BOP has broad authority to determine where to house inmates. Under 18 U.S.C. § 3621(b), it can house federal inmates in any facility "that meets minimum standards of health and habitability established by the [BOP] . . . that the [BOP] determines to be appropriate and suitable, considering . . . the resources of the facility contemplated; . . . the nature and circumstances of the offense; . . . [and] the history and characteristics of the prisoner[.]" It also acknowledges that, inherent in these decisions are considerations of public policy, including "concerns with security, cost,

overcrowding, medical care, and the suitability of each facility to meet the needs of the prisoner." *Lipsey v. United States*, 879 F.3d 249, 255 (7th Cir. 2018).

But the plaintiff is not solely challenging the BOP's decision to house him in the CMU. He is also challenging the prison officials' failure to do anything in response to the complaints he made to them detailing specific threats to his safety. Decisions on whether to act on alleged threats against an inmate is an area that falls "within the protection of the discretionary function exception." *Palay v. United States*, 349 F.3d 418, 428 (7th Cir. 2003). However, if the record does not support an inference that the officials actually exercised judgment, the exception will not apply. *See id.* at 431–32. Here, the United States has not shown that the prison officials exercised any discretion in determining how to respond to Plaintiff's reports of threats. Although it is possible that they decided not to separate Plaintiff from Inmate White as the result of permissible policy judgments, it is also possible that they simply ignored his complaints and the risk that Inmate White posed without weighing any policy considerations. As such, the United States has not met its burden to prove that the discretionary function exception applies to Plaintiff's failure to protect claim.

B. Count 7b – Medical Malpractice:

To prevail on a medical malpractice claim under Illinois law, the plaintiff must prove "(1) the proper standard of care for the defendant physicians; (2) an unskilled or negligent failure to comply with the appropriate standard; and (3) a resulting injury proximately caused by the physicians' failure of skill or care." *Jinkins v. Evangelical Hosps. Corp.*, 783 N.E.2d 123, 126–27 (Ill. App. Ct. 2002); *accord Wipf v. Kowalski*, 519 F.3d 380, 384 (7th Cir. 2008). In addition to the elements described above, Illinois law imposes another substantive requirement under

Section 5/2-622 of the Illinois Healing Art Malpractice Act. Since compliance with the Act is a substantive condition of liability, it applies to FTCA malpractice litigation in federal courts. *Young v. United States*, 942 F.3d 349, 350 (7th Cir. 2019) (citing *Hahn v. Walsh*, 762 F.3d 617 (7th Cir. 2014)), *cert. denied*, No. 19-8587, 2020 WL 5882786 (U.S. Oct. 5, 2020).

Under 735 ILL. COMP. STAT. 5/2-622(a), a plaintiff filing a medical malpractice case must file with his complaint an affidavit from his attorney and a medical report from a health professional. The following pertinent part of the statute explicitly states what must be included in those documents

(a) In any action . . . in which the plaintiff seeks damages for injuries or death by reason of medical, hospital, or other healing art malpractice, the plaintiff's attorney . . . shall file an affidavit, attached to the original and all copies of the complaint, declaring one of the following:

1. That the affiant has consulted and reviewed the facts of the case with a health professional who the affiant reasonably believes: (i) is knowledgeable in the relevant issues involved in the particular action; (ii) practices or has practiced within the last 6 years or teaches or has taught within the last 6 years in the same area of health care or medicine that is at issue in the particular action; and (iii) is qualified by experience or demonstrated competence in the subject of the case; that the reviewing health professional has determined in a written report, after a review of the medical record and other relevant material involved in the particular action that there is a reasonable and meritorious cause for the filing of such action; and that the affiant has concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for filing of such action. If the affidavit is filed as to a defendant who is a physician licensed to treat human ailments without the use of drugs or medicines and without operative surgery, a dentist, a podiatric physician, a psychologist, or a naprapath, the written report must be from a health professional licensed in the same profession, with the same class of license, as the defendant. For affidavits filed as to all other defendants, the written report must be from a physician licensed to practice medicine in all its branches. In either event, the affidavit must identify the profession of the reviewing health professional. A copy of the written report, clearly identifying the plaintiff and the

15

> reasons for the reviewing health professional's determination that a reasonable and meritorious cause for the filing of the action exists, must be attached to the affidavit, but information which would identify the reviewing health professional may be deleted from the copy so attached.

*Id.* The purpose of this requirement is to reduce the number of frivolous malpractice suits. *Ebbing v. Prentice*, 587 N.E.2d 1115, 1117 (Ill. App. Ct. 1992). Cases in federal court that lack the requisite affidavit and report are subject to summary judgment. *Young*, 942 F.3d at 354.

Plaintiff is correct that "Illinois courts liberally construe a physician's certificate of merit in favor of the malpractice plaintiff and recognize that the statute is a tool to reduce frivolous lawsuits by requiring a minimum amount of merit, not a likelihood of success." *Hull v. S. Illinois Hosp. Servs.*, 826 N.E.2d 930, 933 (Ill. App. Ct. 2005). However, it "must be more than a 'generalized conclusion' of malpractice." *Jacobs v. Rush N. Shore Med. Ctr.*, 673 N.E.2d 364, 367 (Ill. App. Ct. 1996) (quoting *Moss v. Gibbons*, 536 N.E.2d 125, 128 (Ill. App. Ct. 1989)). To be sufficient, the report must describe "the deficiencies in medical care that gave rise to plaintiff's claim," "state either the standard of care or an appropriate alternative course of treatment," and "explain how, rather than merely assert that, plaintiff's condition could have been improved by the alternative conduct." *Ortiz v. United States*, No. 13 C 7626, 2014 WL 642426 (N.D. Ill. Feb. 19, 2014); *see also Neuman v. Burstein*, 595 N.E.2d 659, 664 (Ill. App. Ct. 1992), *Hull*, 826 N.E.2d at 935, *Tucker v. St. James Hosp.*, 665 N.E.2d 392, 396 (Ill. App. Ct. 1996).

The report submitted by Plaintiff is insufficient. It states that USP-Marion:

a. Failed to protect Mr. Annamalai from further harm.

b. Failed to, in a timely manner, refer I/P Annamalai to a dental specialist in a timely standard of care manner to treat/salvage his cracked teeth.

16

c. Failed to consider the psychological trauma of his attacker being situated close to his cell and having to hear Mr. White's continuing threats which helped lead to I/P Annamalai's declining mental state.

d. Failed to provide comprehensive timely medical care after the October 13, 2021, attack.

e. Failed to adequately treat his worsening Diabetes Mellitus which was in a non-Diabetes/pre-Diabetes state on entering USP-Marion in 2015. During his incarceration, he developed severe uncontrolled Diabetes Mellitus (as seen by his most recent HgAIC).

It also explains the facts the health professional considered in making his opinions. However, these generalized conclusions of malpractice are not sufficient under Section 5/2-622. For example, the report states that the prison "failed to provide comprehensive timely medical care after the October 13, 2021, attack." But it does not explain the applicable standard of care for medical treatment after an attack, recommend an alternative course of treatment, or detail how an alternative course of treatment could have improved plaintiff's outcomes. The report is insufficient under Illinois law, so Plaintiff's medical malpractice claims cannot survive summary judgment.

Furthermore, the elements of a claim for medical malpractice generally must be established through expert testimony. *Wipf*, 519 F.3d at 384 (citing *Addison v. Whittenberg*, 529 N.E.2d 552, 556 (Ill. 1988)). The only exception is cases "where the physician's conduct is so grossly negligent or the treatment so common that a layman could readily appraise it." *Walski v. Tiesenga*, 381 N.E.2d 279, 282 (Ill. 1978). The malpractice alleged here is based on Nurse Multon, Dr. Pass, and other prison officials deliberate disregard of Plaintiff's medical and mental health needs following his attack by Inmate White. Specifically, the allegations relate to the prison officials' failure to timely provide comprehensive treatment after Plaintiff was attacked by

17

Inmate White, failure to timely refer Plaintiff to a dental specialist to treat/salvage his cracked teeth, and failure to consider the psychological trauma of Inmate White being situated close to his cell and Plaintiff having to hear his continuing threats. This is not the type of situation where the common sense of a laymen could determine the standard of care. *See Comte v. O'Neil*, 261 N.E.2d 21, 22 (Ill. App. Ct. 1970) (stating that the types of cases where a layman can determine the standard of care include "a sponge in the abdomen, an instrument left behind, an X-ray burn or cases of like character which bespeak to the man in the street some carelessness on the part of somebody"). Therefore, the plaintiff needs to provide expert testimony to establish the elements of medical malpractice.

Federal Rule of Civil Procedure 26(a)(2) provides that a party must disclose the identity of any witness it may use at trial to offer expert testimony, and unless stipulated or ordered otherwise, a written report that includes, among other things, the witness's opinions, the basis and reasons for those opinions, the facts or data the witness considered in forming those opinions and the witness's qualifications to serve as an expert. The rule contains a default deadline for expert disclosures:

> A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made:
>
> > (i) at least 90 days before the date set for trial or for the case to be ready for trial . . . .

FED. R. CIV. P. 26(a)(2)(D)(i). The default deadline does not apply in this case because the Court set a specific deadline for the close of discovery. The discovery deadline was October 11, 2024. That deadline has long passed, and the plaintiff has not disclosed an expert witness. Under Federal Rule of Civil Procedure 37(c)(1), if a party fails to disclose an expert witness, they are not allowed to use that "witness to supply evidence on a motion, at a hearing, or at a trial, unless

18

the failure was substantially justified or is harmless." Since Plaintiff does not have an expert witness to testify at trial, he cannot make out his claim of medical malpractice.

C. Counts 9 – Intentional Infliction of Emotional Distress:

To prevail on a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must prove that (1) the conduct involved was "truly extreme and outrageous," (2) the defendant either intended to inflict, or knew there was a high probability he would cause, severe emotional distress, and (3) the defendant actually caused severe emotional distress. *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003) (citing *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988)). To support an IIED claim, the conduct must be "so severe that no reasonable man could be expected to endure it." *Feltmeier*, 798 N.E.2d at 84 (citing Restatement (Second) of Torts § 46 cmt. j (A.L.I. 1965)). "Conduct is of an extreme and outrageous character where 'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994) (quoting Restatement (Second) of Torts § 46 cmt. d (A.L.I. 1965)).

The FTCA prohibits the recovery of compensatory damages for mental or emotional injuries without any showing of a physical injury. *See* 28 U.S.C. § 1346(b)(2). Section 1346(b)(2) states that: "[n]o person convicted of a felony who is incarcerated . . . while serving a sentence may bring a civil action against the United States . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury." *Id.* This is consistent with the Prison Litigation Reform Act ("PLRA"), which limits recovery for mental or emotional injuries in federal civil actions brought by a prisoner to those with a prior showing of a physical injury. *See* 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined

in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . ."). However, the Seventh Circuit has decreed that this latter provision does not bar the actual filing of a suit but instead serves as a limitation on damages. *Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003). Without a physical injury, a plaintiff can only recover nominal damages, punitive damages, and fees. *Id.* But unlike the PLRA, the FTCA does not permit recovery of punitive damages. *See* 28 U.S.C. § 2674 ("The United States . . . shall not be liable for interest prior to judgment or for punitive damages."). Further, it does not require the United States to pay attorney's fees. *See* 28 U.S.C. § 2678 (stating that attorney's fees are deducted from the plaintiff's recovery and may not be in excess of 25% of any judgment rendered). Therefore, if Plaintiff is unable to show a physical injury, his recovery is limited to, at most, nominal damages.

The plaintiff alleges that the United States engaged in two courses of conduct that caused him severe emotional distress. The first is that the prison officials ignored his warnings that his life was in danger, and because of their failure to act, he suffered an attack by Inmate White. The attack resulted in physical injuries, including an abrasion above his left ear, several areas of edema to the back of his head, and three fractured teeth, and emotional distress, which manifested as anxiety, flashbacks, and nightmares. This alleged conduct, and the resulting injuries, will not support a claim for intentional infliction of emotional distress. The same exact conduct is the basis for Plaintiff's failure to protect claim. Any injuries Plaintiff sustained because of the prison officials' failure to act, including any emotional distress he suffered because of their inaction, can be recovered in that claim.

The second is that, after Plaintiff was attacked by Inmate White, he was placed in the

20

SHU in a cell adjacent to his attacker for fifty days. During the fifty days, Inmate White emotionally tormented Plaintiff with repeated harassment and threats. Plaintiff notified prison officials of the harassment and threats and asked to be moved, but they ignored his requests. As a result, Plaintiff experienced anxiety and fear and started to become suicidal. This alleged conduct, and the resulting injuries, cannot be recovered for in a claim for intentional infliction of emotional distress. The Court starts by noting that, since Plaintiff's placement in the SHU caused him only mental and emotional injuries, his recovery is limited to, at most, nominal damages. The FTCA does not prohibit recovery of nominal damages, so whether they can be recovered is determined by Illinois law. *See* 28 U.S.C. § 2674 (stating that the United States is liable "in the same manner and to the same extent as a private individual under like circumstances"). The Court has not found an Illinois case that addresses whether a plaintiff can recover nominal damages in a claim for intentional infliction of emotional distress. However, the Court finds that it does not need to decide this issue because Plaintiff's claim is barred by the discretionary function exception.

The BOP has broad authority to determine where to house an inmate. *See* 18 U.S.C. § 3621. In addition, the Warden has discretion to determine whether to place an inmate in administrative detention. *See* 28 C.F.R. § 541.22 (stating that an inmate may be placed in the SHU on administrative detention status when "necessary to ensure the safety, security, and orderly operation of correctional facilities, or protect the public"). Therefore, USP-Marion's Warden had broad discretion to determine whether to house Plaintiff in the SHU, and whether to house him near his attacker Inmate White. Here, there is evidence that the Warden exercised discretion in making the placement. The placement decision reflected consideration of the

21

ongoing need to monitor the inmates' communications, and to keep them separated and housed apart from the larger CMU population pending investigation, DHO proceedings, and consideration of the need for a separation order. Because the Warden exercised his discretion in placing Plaintiff in the SHU, it is presumed that his discretionary act was grounded in considerations of public policy. *Sebolt v. United States*, 769 F. App'x. 381, 382 (7th Cir. 2019) (citing *Gaubert*, 499 U.S. at 324). The Court will not disturb the Warden's decision to place Plaintiff in the SHU. Since the United States has met its burden of proving that the discretionary function exception applies, Plaintiff's claims for intentional infliction of emotional distress cannot survive summary judgment.

    D.  <u>Counts 10 – Negligent Infliction of Emotional Distress:</u>

    A plaintiff can recover for negligent infliction of emotional distress ("NIED") if they prove that the defendant owed them a duty, the defendant breached that duty, and the breach caused an injury to the plaintiff. *Schweihs v. Chase Home Fin., LLC*, 77 N.E.3d 50, 58 (Ill. 2016); *Corgan v. Muehling*, 574 N.E.2d 602, 606 (Ill. 1991). They must also have a contemporaneous physical injury or impact. *Schweihs*, 77 N.E.3d at 59; *Corgan*, 574 N.E.2d at 605–06. As discussed above, Plaintiff does not have a claim for negligent infliction of emotional distress based on the prison officials' failure to investigate his complaints that his life was in danger. The same conduct is the basis for his failure to protect claim. In addition, Plaintiff does not have a claim for negligent infliction of emotional distress based on his placement in the SHU. The claim fails for two reasons. First, since the conduct did not result in physical injury, Plaintiff cannot recover any damages. Illinois courts do not award nominal damages for negligence claims. *See Crosby v. City of Chicago*, 298 N.E.2d 719, 722 (Ill. App. Ct. 1973).

22

Second, as outlined above, the discretionary function applies to the Warden's placement decision and shields the United States from liability. Therefore, Plaintiff's claims for negligent infliction of emotional distress cannot survive summary judgment.

## IV.    <u>CONCLUSION</u>

There are two genuine disputes of material fact in Plaintiff's failure to protect claim. The first is whether Plaintiff transmitted the letter to Dr. Fields. The second is whether Plaintiff had reasonable protection from Inmate White. Since there are two genuine issues of material fact, and the discretionary function does not apply, the Court DENIES the Motion for Summary Judgment (Doc. 142) as to Count 3. Plaintiff's medical malpractice claim cannot survive summary judgment because: (1) the certificate of merit is insufficient, and (2) Plaintiff does not have an expert witness to testify at trial and make out his claims. Therefore, the Court GRANTS the Motions for Summary Judgment (Doc. 136; Doc. 142) as to Count 7b. Plaintiff's claim of intentional infliction of emotional distress cannot survive summary judgment because the discretionary function exception applies to the Warden's decision to place Plaintiff in the SHU near his attacker. In addition, Plaintiff's claim of negligent infliction of emotional distress fails for two reasons. First, there are no damages that Plaintiff can recover for the claim. Second, the discretionary function exception applies to the placement decision. Accordingly, the Court GRANTS the Motion for Summary Judgment (Doc. 142) as to Counts 9 and 10.

**IT IS SO ORDERED.**
**DATED**:  October 2, 2025

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**United States District Judge**

23