UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ANNAMALAI ANNAMALAI,<br>Plaintiff,<br>v.<br>UNITED STATES OF AMERICA,<br>Defendant. | Case No. 22-cv-01541-JPG |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case is before the Court following a bench trial. Plaintiff Annamalai Annamalai is a federal inmate incarcerated at the Federal Detention Center in SeaTac, Washington.[1] He appeared remotely represented by his appointed counsel, Brent Larsen Salsbury.[2] Defendant United States of America was represented by Suzanne M. Garrison. Annamalai called nine witnesses: himself, Nakia Adams, William White, Delores Churn, Kathy Hill, Nathan Simpkins, Dr. Annabel Fields, Robert Blair, and Thomas Fleming. The United States called three witnesses: Kurt Rushing, Andrew Moulton, and Jason Simmons.

## I. BACKGROUND

Annamalai brought this case under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 et seq., and *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971), complaining of conduct by the Federal Bureau of Prisons ("BOP") and its employees at the Federal Correctional Institution in Marion, Illinois ("FCI Marion").[3] He alleges that they failed

[1] At the time of the bench trial, Annamalai was incarcerated at the Federal Correctional Institution in Lompoc, California.

[2] The Court is deeply grateful for the exceptional representation that counsel provided to Annamalai. Such *pro bono* efforts play an important role in ensuring that litigants who are unable to effectively represent themselves have a meaningful opportunity to present their cases in court.

[3] During this litigation, the BOP renamed the facility from a United States Penitentiary to a Federal Correctional Institution. For the purposes of this Order, the Court will refer to the facility by its current name, FCI Marion.

to protect him from the serious risk of harm fellow inmate William White ("Inmate White") posed to his health or safety, which ultimately resulted in Inmate White attacking Annamalai on October 13, 2021. He also alleges that, following the attack, BOP officials deliberately disregarded his medical and mental-health needs and that their actions constituted intentional infliction of emotional distress and negligent infliction of emotional distress.

The Court tried the only remaining claim in this case: Annamalai's claim that the United States is liable under the FTCA for the negligence of BOP officials in failing to protect him from Inmate White.[4] The United States asserts that it is entitled to immunity under the discretionary function exception to the FTCA for the conduct of the BOP officials and that, if it is not, the BOP officials were not negligent.

Pursuant to Federal Rule of Civil Procedure 52(a)(1), the Court makes the following relevant findings of fact and conclusions of law.

## II. <u>FINDINGS OF FACT</u>

The Court finds the following relevant facts by a preponderance of the evidence:

<u>Initial Conviction and Sentencing:</u>

1. In 2013, a jury found Annamalai guilty of fraud in connection with his operation of a Hindu temple. He received a sentence of twenty-seven years.
2. Following imposition of sentence, the district court remanded Annamalai to the custody of the BOP. The Judgment and Conviction Order contained a communication restriction as

[4] The Court dismissed Annamalai's *Bivens* claim against BOP officials for failing to protect him from Inmate White with prejudice for failure to state a claim and failure to exhaust administrative remedies (Doc. 122). The Court granted summary judgment in favor of the United States on Annamalai's FTCA claims asserting that BOP officials deliberately disregarded his medical and mental health needs following his assault by Inmate White and that the BOP officials' actions constituted intentional infliction of emotional distress and negligent infliction of emotional distress (Doc 158). The Court dismissed several other claims at screening (Doc. 25).

follows:

> The Court orders that, while in Bureau of Prisons custody, the defendant shall have no phone privileges, save the phone privilege to speak with attorneys that represent him in legal actions or court-appointed stand-by legal counsel. This order prohibits the defendant's participation in any type of phone call – whether by three-way call, conference call, or other means – with any individual other than attorneys that represent him or his standby counsel.

3. At various times the BOP housed Annamalai in the Communications Management Units ("CMUs") at FCI Terre Haute and FCI Marion ("Marion CMU").

4. CMUs were created to "house inmates who, due to their current offense of conviction, offense conduct, activity while incarcerated, or other verified information, require increased monitoring of communication between the inmate and persons in the community to protect the safety, security, and orderly operation of the BOP or to protect the public." U.S. DEP'T OF JUST., FED. BUREAU OF PRISONS, LEGAL RESOURCE GUIDE TO THE FEDERAL BUREAU OF PRISONS 18–19 (2019).[5]

5. The CMU "is a general population unit, with access to customary inmate activities, such as recreation, religious services, and education programming." *Id.*

6. The BOP uses an extensive process to designate inmates to the CMU. It chose to place Annamalai in the CMU based on his offense of conviction, the substantial likelihood that he would engage in furtherance of illegal activity through communication with persons in the community, the substantial likelihood that he would contact victims of his offense of conviction, and his history of abusing approved communication methods while incarcerated.

---

[5] https://www.bop.gov/resources/pdfs/legal_guide_march_2019.pdf

7. Inmates could work toward step down and removal from the CMU by moderating their own conduct and demonstrating to staff that there was no longer a need to monitor their communications at the level that occurs within the CMU.

8. Intelligence Research Specialist Kathy Hill played a key role in the daily operation of the CMU. Part of her responsibilities were to perform threat assessments and conduct protective custody and incident investigations.

9. Inmate protective custody placements may arise from inmate requests or from staff observations. During a protective custody investigation arising from a concern expressed by an inmate about his safety, the inmate is placed into the SHU so that an investigation can determine whether there is a verifiable threat.

10. If an incident investigation revealed inmate safety concerns, Hill would write a report and recommend to the Warden that the inmates be separated.

11. If Hill recommended separation, she included a discussion of which inmate should be transferred based on consideration of the overall dynamic of the unit and any other conflicts within it. Her recommendation would then be forwarded to the Unit Team, which would complete and submit a packet to the Designation Center.

Appeal and Resentencing:

12. In September 2019, the Eleventh Circuit reversed Annamalai's convictions on twenty-two of the thirty-four counts, and remanded for resentencing. At this time, Annamalai was housed in the Marion CMU.

13. In February 2020, Annamalai left the Marion CMU on a writ for resentencing.

14. Annamalai testified that in June and July of 2021, he wrote letters to the BOP's designation and sentence computation center in Texas, the U.S. Marshal in Atlanta, Hill, Case Manager Gary Burgess, the Warden, and BOP attorney Katherine Siereveld. Annamalai does not have copies of any of these letters.

15. Annamalai testified that the letters described past attacks, including one in which Inmate White used another inmate to attack him, causing Annamalai to fear for his life, and asked that he not be returned to the Marion CMU. The Court finds that this testimony is not credible because it conflicts with his prior testimony from his deposition that he could not remember if he mentioned Inmate White in these letters.

16. In August 2021, Annamalai was resentenced to eighteen-years. The Amended Judgment and Commitment Order ordered that while Annamalai is in BOP custody, he "shall only have phone privileges to communicate with his family, counsel, and medical care providers." It also recommended that he not be housed in the CMU.

<u>Encounter with Dr. Churn at FCI Atlanta:</u>

17. On September 17, 2021, Annamalai spoke with Staff Psychologist Dr. Dolores Churn at FCI Atlanta, and she documented the encounter with a Clinical Contact Note.

18. Annamalai stated that he was concerned about going to the facility where he is designated and indicated that he was in fear for his life. He told her he was concerned about Taliban and Muslim terrorists in the CMU. At the time of the encounter, Annamalai did not know which institution the BOP would select for him.

19. Annamalai never mentioned having any concerns about Inmate White or any other specific inmate. If he had mentioned concerns about a particular inmate, Dr. Churn would have

documented it.

Correspondence with Sentencing Judge:

20. On September 20, 2021, Annamalai sent his sentencing judge, the Honorable Timothy Batten, a letter expressing fears about Taliban, Al-Qaeda, ISIS and Al-Shabaab operatives housed in the CMU and concerns that he would be murdered. The letter did not mention Inmate White.

Decision to Return Annamalai to the Marion CMU:

21. Following his resentencing, the BOP returned Annamalai to the Marion CMU. It chose to return him there because: (1) when an inmate is moved out of a facility on a writ, the policy of the BOP is to return that inmate to that same institution upon completion of the writ; (2) there was both a recommendation that he not be returned to the CMU and a recommendation that he be subject to communication restrictions, and a return to the CMU was the best setting for that monitoring; and (3) he had not graduated from the CMU program.

Intake Screening at the Marion CMU:

22. Annamalai arrived at the Marion CMU on October 1, 2021.

23. Upon his arrival, Case Manager Kurt Rushing conducted an intake interview with Annamalai and recorded information on an Intake Screening Form. The intake interviews are confidential and are conducted one-on-one in an office in the Receiving and Discharge Department. In conducting the interviews, Rushing would read the question, the inmate would answer, and Rushing would check the appropriate box. He would then have the inmate sign the form after an opportunity to review it.

24. On Annamalai's intake form, Rushing checked the "no" box in response to question, "Do you know of any reason that you should not be placed in general population." This signified that Annamalai raised no concerns that would have justified contacting the Operations Lieutenant or anyone else about Annamalai's safety.

25. Annamalai testified that he did not mention Inmate White during the intake interview because there was no place on the Intake Screening Form to write it. The Court finds that this testimony is not credible, as the Intake Screening Form contains three blank lines for interviewer comments.

26. Chief Psychologist Dr. Annabel Fields also met with Annamalai on October 1, 2021, to conduct a brief intake screening. Dr. Fields's screening included review of a PSIQ form that Annamalai completed.

27. Dr. Fields recalled that Annamalai became verbose at intake, so she suggested he put his mental health concerns or issues in writing. She noted that he did not appear to be anxious beyond what is normal for an inmate arriving at an institution.

28. Annamalai denied that Dr. Fields conducted a psychological screening interview of him on October 1, 2021. The Court finds Dr. Fields's testimony regarding her intake screening, as documented in her encounter note, more persuasive.

<u>Time in Segregation:</u>

29. From October 1, 2021, to October 5, 2021, Annamalai was housed in the segregation unit of the CMU in a single-man cell due to a need to verify his COVID vaccination.

30. Annamalai's assigned Case Manager, Nathan Simpkins, had an initial meeting with Annamalai while he was in quarantine. Thereafter, Simpkins interacted with Annamalai

daily.

31. Simpkins recalled that Annamalai referenced some issues with Inmate White. He told Annamalai that if he was concerned about his safety then they could speak with Hill, do the paperwork, and keep him in the SHU. Annamalai responded that he did not want to go to the SHU, he wanted Inmate White to go to the SHU. Simpkins told Annamalai that is not how it works, and that if he fears for his safety, they can keep him safe. Annamalai made it clear he did not want to pursue that option.

32. Simpkins characterized Annamalai's reference to his issues with Inmate White as the type of thing staff heard a lot—inmates that did not get along, but they managed the situation by staying away from each other to avoid confrontation. He did not recall any conversations with Annamalai regarding threats of violence.

33. Simpkins explained that he is required to balance multiple considerations simultaneously, including institutional safety, the safety and security of staff and inmates, and the orderly operation of the institution. He must also assess validity of complaints and guard against the possibility that he is being manipulated by inmates.

34. Simpkins distinguished between threats of violence involving bodily harm and harassment. He stated that, when an inmate expresses fear for his life and indicates concern that harassment will escalate into an attack, he could opt to place the complaining inmate into the SHU for his protection immediately. If the threat were less immediate, he could confer with Hill so that she could investigate. Alternatively, if the concerns were of a lesser nature, he could opt to discuss the situation with the inmates.

<u>Inmate White:</u>

35. In October 2021, Inmate White was not a separatee of Annamalai.

36. The BOP classified both Inmate White and Annamalai as low-security inmates.

37. Hill did not consider Inmate White a shot-caller. She referred to him as a loner.

38. Operations Lieutenant Robert Blair had not experienced Inmate White being violent toward any other inmate prior to October 13, 2021, nor did he ever witness an incident between Inmate White and Annamalai which warranted any de-escalation techniques. Blair never received any credible report that Inmate White presented a risk of harm to Annamalai.

39. Officer Thomas Fleming was never made aware of any harassment of Annamalai by Inmate White prior to October 13, 2021. He described Inmate White as a quiet inmate, and he did not have any concerns that Inmate White would pose a danger to other inmates.

40. Simpkins had no recollection of any fights involving Inmate White and did not consider Inmate White to be a violent inmate. He described Inmate White as extremely focused on his legal work, such that it occupied much of his time. He never observed Inmate White displaying volatility, acting erratic, or flying off the handle.

41. Inmate White's disciplinary record revealed one incident of fighting in April 2021.

<u>Annamalai Returns to the General Population:</u>

42. On October 5, 2021, Annamalai returned to the general population of the Marion CMU.

43. During mail call, Annamalai usually had some issues that he needed to be addressed, and Hill had many conversations with him between October 5, 2021, and October 13, 2021. In these conversations, Annamalai told Hill he was afraid of being in the Marion CMU but said nothing specific about who he was afraid of. Hill told him many times about the option to go into protective custody.

44. Hill testified that Annamalai approached her about Inmate White making fun of him and said that Simpkins did not do anything about it and it humiliated him. When Annamalai mentioned Inmate White, Hill asked Annamalai if he wanted protective custody and he said that he was not afraid of anybody. Hill told Annamalai that if he changed his mind, he could go to any staff member and tell them that he wants protective custody, and they will place him in the SHU and investigate.

45. In the exercise of her discretion, Hill had authority to place an inmate in protective custody, even if the inmate did not want to enter protective custody, if she believed there was a threat to the inmate.

46. Hill testified that she had no reason to think Inmate White was going to assault Annamalai. She never observed any interaction between Inmate White and Annamalai which she thought was concerning, and at no point did Annamalai ever make a clear expression to Hill of concern that Inmate White was going to harm him.

Letter to Dr. Fields Dated October 10, 2021:

47. It was Dr. Fields's practice to do pre-rounds on Tuesdays so she could distribute materials to inmates that they had requested. Then, on Wednesdays, she would do rounds with the rest of the Executive Team. If an inmate wanted to deliver anything to her, she would collect that material on Wednesday.

48. Annamalai typed a six-page letter to Dr. Fields on October 10, 2021. The letter lists ten inmates that Annamalai characterized as involved in his emotional tortures, harassment, intimidations, or otherwise assaults who are still housed with him in the Marion CMU. The first inmate on the list was Inmate White. The letter also described an incident on October

9, 2021, when Inmate White referred to the Lord Shiva as a "PENIS HINDU GOD" and made a reference to Annamalai being beheaded in Algeria. The letter urged Dr. Fields to recommend that Annamalai should not be housed with the listed inmates.

49. Dr. Fields is certain that Annamalai did not provide her with the letter because of her routine practice and procedure. When an inmate hands her a written document, she reads or scans it while she is still with the inmate. This is because, within the first few months of her career as a staff psychologist, she collected inmate notes while on rounds in the SHU, got back to her office, and found a note from an inmate stating that he was suicidal but containing no name, number, or call number that would allow her to determine who had written the note. Since then, she religiously checks notes before walking away from the cell.

50. Dr. Fields indicated that she received many letters from Annamalai and that it was her practice to include letters in his file if it led to a significant clinical contact. This testimony is corroborated by Annamalai's psychology services file, which includes a copy of letters written by him that bear the date of October 22, 2021.

51. Based on Dr. Fields's routine practice and procedures for handling letters she receives from inmates, the Court credits her testimony that she did not receive the October 10, 2021, letter.

<u>Bumping Incident in Front of Simpkins:</u>

52. Annamalai testified that, on October 13, 2021, at mail call, he told Simpkins that Inmate White was harassing him. He testified that Inmate White then bumped into him three times

in front of Simpkins and other inmates. He testified that Simpkins laughed, leaving him humiliated.

53. Annamalai testified that, following this incident, he told Simpkins that Inmate White is harassing him every day and asked him to do something about it. He claimed that he asked to be taken out of the unit and stated he did not want to get attacked or killed by Inmate White.

54. Inmate White denied that this bumping incident occurred. He testified that Annamalai flipped out and started screaming at him in front of Simpkins, prompting him to tell Annamalai, "Stay away from me if you know what's good for you." He testified that this statement was not a threat, it was a request that Annamalai stay away from him.

55. Simpkins denied that he ever made fun of Annamalai and had no recollection of the bumping incident.

<u>TRULINCS Message to Hill:</u>

56. Annamalai testified that after Simpkins failed to help him, he went to his cell and sent a TRULINCS message to Hill at 2:34 PM on October 13, 2021. The message did not mention Inmate White or Simpkins. It asked to speak with Hill the next day or on Friday. Annamalai testified that he did not request an immediate meeting because he did not have any clue he was going to get beaten up later that day. Hill did not see the TRULINCS message until the next day.

<u>Attack by Inmate White:</u>

57. On October 13, 2021, Annamalai was housed in the D range of the Marion CMU and Inmate White was housed in the C range of the unit.

58. At around 8:00 PM, Annamalai went to the C range to meet with an inmate who went by the nickname of "Shawn" to watch the television show "Sistas" on BET.

59. While Annamalai was in the C range, he was involved in an altercation with Inmate White. The altercation was captured on video. The video does not include audio.

60. The altercation began by Inmate White walking past the table where Annamalai was sitting. Annamalai testified that, as Inmate White walked past, he verbally assaulted him by calling him a "Hindu bastard." Inmate White denied that he exchanged words with Annamalai before the altercation. The Court finds Annamalai's testimony on this issue to be more credible because, from the video, it appears that Inmate White said something to Annamalai.

61. Annamalai remained silent and continued to watch the television. He testified that he could have gotten up and walked out of the C range, but it did not strike his mind to do so.

62. Inmate White then walked up to where Annamalai was seated and hit him from behind. Annamalai fell to the floor, and Inmate White struck him a minimum of twelve times with his hand.

63. Annamalai testified that he was getting unconscious, was being choked to death, was unable to breathe, and had no movement in his body.

64. During the altercation, Annamalai attempted to defend himself by striking Inmate White with scissors that he retrieved from his pocket.

65. The altercation lasted between 1 minute and 15 seconds and 1 minute and 30 seconds until it was broken up by Fleming, who witnessed the incident on the security cameras in the officer station.

66. Fleming observed that Annamalai was conscious, that he was not bleeding, and that there was no blood on the floor.

67. Based on his experience as a correctional officer, Fleming did not view the incident as an attempted murder. There was no weapon, Inmate White made no effort to choke out Annamalai, and Inmate White spent part of the encounter just holding Annamalai down.

68. Staff photographed Annamalai after the incident. Blair observed that Annamalai had minor abrasions in the facial area, but he did not observe any swelling or bruising on the top or back of Annamalai's head.

69. Had the incident involved bloodshed, an inmate blood spill crew trained and supervised by Health Services would have been called to the scene for safe removal, and the blood would have been photographed for evidentiary purposes. Because the incident did not involve bloodshed, neither step was necessary.

70. Staff placed Annamalai and Inmate White in separate cells in the SHU following the incident and while pending investigation.

<u>Hill's Investigation:</u>

71. Based on her experience in the BOP and following her review of the video, Hill testified that the incident did not rise to the level of an attempted murder. Inmate White stopped striking Annamalai during the incident and began just holding him down. Inmate White did not use any weapon and was wearing slides as contrasted with heavier footwear.

72. Hill determined that White was the aggressor in the fight and that Annamalai did not do anything to provoke him.

73. Fleming issued Annamalai an incident report because BOP policy is that if you fight back during an incident, it is considered fighting.

74. Following the incident, Inmate White and Annamalai became separatees. Eventually, the BOP stepped Annamalai out of the CMU.

Inmate White's Testimony Regarding the Incident:

75. Inmate White testified that, prior to the October 13, 2021, incident, he did not ever threaten violence to Annamalai.

76. Inmate White testified that he did make fun of Annamalai, but it was not because of his faith. Instead, he made fun of him because he considered him a liar, a thief, a con man, an evil person who would often manipulate other people, a person who would do very strange and gross things in public, a person who would vandalize things that belonged to the general population, a person who made phony complaints about people to the guards, and a person who would file phony documents in court.

77. In describing the incident, Inmate White testified that he just snapped and did not know what came over him. He went over to tell Annamalai to buzz off but realized there was nothing he could say to make Annamalai buzz off.

78. Inmate White testified that he only recalled hitting Annamalai five or six times due to his PTSD, which the BOP knew about but refused to treat.

79. Inmate White claimed his PTSD caused him to beat up two other inmates prior to October 13, 2021. The Court finds that Inmate White's testimony regarding these incidents is not credible. Inmate White's disciplinary record only revealed one other incident of fighting. Hill recalled two incidents involving Inmate White. One involved Inmate White putting

another inmate into a hold to keep that inmate from assaulting him, and the other involved Inmate White going off on another inmate.

80. Inmate White stated that, once he snapped out of the PTSD episode, he stopped hitting Annamalai and pinned him and his hand to the ground.

81. Inmate White maintained that he stopped striking Annamalai in the head before Annamalai started striking him with the scissors.

82. Inmate White testified that he put his knee on Annamalai's neck to keep him pinned to the ground to avoid getting stabbed again. He told Annamalai to let go of the scissors and he would let Annamalai go, but Annamalai would not let go of them.

83. Inmate White testified that he was not trying to kill Annamalai. He also denied choking Annamalai.

84. As for Inmate White's claims of PTSD, Dr. Fields did not assign that diagnosis to him. Prior to October 13, 2021, Dr. Fields had not observed Inmate White in any violent outbursts and did not think he presented a safety concern.

<u>Annamalai's Characterization of the Incident:</u>

95. Annamalai characterized the incident with Inmate White as an attempted murder that left him bleeding badly and near death. In a later filed compassionate release motion, Annamalai claimed that he shed blood over seven feet on the floor after a murder attempt.

96. The video of the incident and photos taken after it do not show that Annamalai was bleeding badly or was near death. His testimony also conflicts with the testimony of Blair and Fleming. The Court finds that Annamalai's characterizations of the incident reflect poorly on his credibility and reveals a tendency toward exaggeration.

## III. CONCLUSIONS OF LAW

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1346(b)(1).

A. Legal Standard:

The FTCA is a limited waiver of the Government's sovereign immunity. *See* 28 U.S.C. § 1346(b)(1). It gives federal courts

> exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for . . . personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*Id.* The FTCA allows the United States to be held liable for tort claims "in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674; *see United States v. Muniz*, 374 U.S. 150, 153 (1963); *Augutis v. United States*, 732 F.3d 749, 752 (7th Cir. 2013), *cert. denied*, 574 U.S. 921 (2014). To determine how a private individual would be treated, the Court must apply the substantive law of the state where the act or omission occurred. *FDIC v. Meyer*, 510 U.S. 471, 478 (1994); *Augutis*, 732 F.3d at 752. The acts or omissions alleged in this case occurred at FCI Marion, so Illinois substantive law applies.

*i. Liability for Negligence:*

Under Illinois law, a private person would be liable for negligence if the plaintiff establishes by a preponderance of the evidence "that the defendant owed a duty to the plaintiff, that defendant breached that duty, and that the breach proximately caused injury to the plaintiff." *Choate v. Indiana Harbor Belt R.R. Co.*, 980 N.E.2d 58, 64 (Ill. 2012).

Prison officials have a statutory duty to "provide suitable quarters and provide for the safekeeping, care, and subsistence" and "the protection, instruction, and discipline of all persons

charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2) & (3); *see also Palay v. United States*, 349 F.3d 418, 428 (7th Cir. 2003). In determining if a specific duty exists, the primary consideration is whether the harm was reasonably foreseeable. *Popp v. Cash Station, Inc.*, 613 N.E.2d 1150, 1153 (Ill. App. Ct. 1992).

"A criminal attack by a third person is reasonably foreseeable when the circumstances are such as to put a reasonably prudent person on notice of the probability of an attack or when a serious physical altercation has already begun." *Reynolds v. CB Sports Bar, Inc.*, 623 F.3d 1143, 1148 (7th Cir. 2010) (quoting *Shortall v. Hawkeye's Bar & Grill*, 670 N.E.2d 768, 770 (Ill. App. Ct. 1996)). Even if the attack is foreseeable, "courts must still decide whether to impute a duty to protect against the attack." *Id.* There are several factors relevant to determining whether to impose a duty to protect, including: "(1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing that burden on the defendant." *Id.* (quoting *Marshall v. Burger King Corp.*, 856 N.E.2d 1048, 1057 (7th Cir. 2010)).

Proximate cause is made up of "two distinct requirements: cause in fact and legal cause." *Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992). Cause in fact exists when "there is a reasonable certainty that a defendant's acts caused the injury or damage" and the defendant's conduct "was a material element and a substantial factor in bringing about the injury." *Id.* Legal cause is established if the injury is foreseeable, or more specifically, it "is of a type which a reasonable man would see as a likely result of his conduct." *Id.* at 503.

*ii. Discretionary Function Exception:*

Congress crafted several exceptions to § 1346(b)(1)'s waiver of immunity. 28 U.S.C. §

2680; *see, e.g.*, *Smith v. United States*, 507 U.S. 197, 199 (1993); *Rothrock v. United States*, 62 F.3d 196, 197 (7th Cir. 1995). One such exception is for claims arising from government acts and decisions that are based on considerations of public policy. *See United States v. Gaubert*, 499 U.S. 315, 322–23 (1991). This so-called "discretionary function exception" provides that the United States has not waived its sovereign immunity for

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). To fall within the discretionary function exception, the acts giving rise to the suit must meet two requirements: (1) the acts must be discretionary in nature in that they involve an element of judgment or choice, and (2) the judgment exercised in the act must be the type of judgment that the discretionary function exception was designed to shield. *Gaubert*, 499 U.S. at 322–23 (citing *Berkovitz v. United States*, 486 U.S. 531, 536 (1988); *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984)).

To determine whether an act is discretionary because it involves an element of judgment or choice, the Court must examine the nature of the act, not the status of the actor. *Gaubert*, 499 U.S. at 322. Even if an act is discretionary because it involves an element of judgment or choice, the discretionary function exception will not apply unless the judgment exercised was the type that the exception was designed to shield from liability. *Id*. at 322–23. The exception was designed to "'prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.* at 323 (quoting *Varig Airlines*, 467 U.S. at 814). Thus, for the discretionary function exception to apply, the judgment

exercised must be based on considerations of public policy. *Gaubert*, 499 U.S. at 323. The discretionary function exception is an affirmative defense that the United States must prove beyond a reasonable dispute. *Keller v. United States*, 771 F.3d 1021, 1023 (7th Cir. 2014).

B. Analysis:

The United States has proven beyond a reasonable dispute that it is entitled to the benefit of the discretionary function exception. The Court already determined at summary judgment that the BOP's decision to return Annamalai to the Marion CMU following resentencing and its decision to place Annamalai in the SHU after the altercation with Inmate White were shielded by the discretionary function exception. Accordingly, the only relevant period is from October 5, 2021, when Annamalai returned to the general population of the Marion CMU, to October 13, 2021, when Annamalai was attacked by Inmate White.

The decisions by Hill and Simpkins to not place Annamalai into protective custody or otherwise separate him from Inmate White are protected by the discretionary function exception. Inmate White was not a separatee of Annamalai, and BOP officials did not consider Inmate White to be a violent inmate. Annamalai's specific complaints about Inmate White to Hill and Simpkins described his concerns as harassment rather than threats of violence. When Annamalai raised these concerns, both Hill and Simpkins spoke with Annamalai and explained the procedures for seeking protective custody pending an investigation. Annamalai did not express a desire to be placed into protective custody. The decision not to place Annamalai into protective custody represented an exercise of discretion and balanced multiple considerations, including institutional safety, the safety and security of staff and inmates, and the orderly operation of the institution. Simpkins and Hill were not required to blindly accept Annamalai's complaints. Rather, they were entitled to

exercise their discretion to assess the validity of his concerns. Hill and Simpkins exercised this discretion and weighed the appropriate considerations and they ultimately concluded that there was no credible threat to Annamalai's safety that warranted separation pending investigation.

Even if the United States were not entitled to the benefit of the discretionary function exception, Annamalai has not proven by a preponderance of the evidence that the United States breached a duty to protect him from Inmate White. First, BOP officials had no reason to believe Inmate White posed a general danger to others in the Marion CMU. They did not consider Inmate White to be a violent inmate; instead, they considered him to be a loner that was focused on his legal work.

Second, BOP officials were not on notice of a specific threat that Inmate White posed to Annamalai's safety. At the time of the attack, Inmate White was not a separatee of Annamalai. The letters that Annamalai sent before his return to the Marion CMU did not mention Inmate White and primarily expressed concerns about Taliban and Muslim extremists. In his intake interviews, Annamalai did not express any fears of Inmate White. Annamalai made a few specific complaints about Inmate White to Hill and Simpkins, but he described his concerns as harassment rather than threats of violence. In response to those complaints, both Hill and Simpkins asked Annamalai if he would like to be placed in protective custody pending an investigation, but Annamalai declined. The bumping incident that occurred in front of Simpkins on October 13, 2021, did not provide notice that Annamalai faced a risk of serious harm from Inmate White. Annamalai was not injured in the incident, and Inmate White did not threaten to harm him. At the Marion CMU, it was not unusual for inmates to have conflicts but simply avoid each other. That is how Simpkins understood the relationship between Inmate White and Annamalai. Nothing about this interaction

gave Simpkins reason to believe that Inmate White would harm Annamalai. Dr. Fields did not receive Annamalai's October 10, 2021, letter expressing fear of Inmate White. Annamalai's TRULINCS message to Hill did not express a fear of Inmate White and was not received until after the attack.

Third, Inmate White and Annamalai's testimony establishes that neither could foresee the attack. Inmate White characterized his actions as sudden and impulsive. His failure to utilize a weapon and his choice of footwear corroborate his characterization of the attack as spontaneous. Annamalai testified that, on the night of the attack, he went into Inmate White's cell block to watch television. Before the attack, Inmate White walked past him and made a hateful remark. Annamalai acknowledged that he had the opportunity to get up and leave at that point, but it did not strike his mind to do so. If neither Inmate White nor Annamalai could foresee the attack, then BOP officials could not reasonably foresee it either.

## IV. <u>CONCLUSION</u>

The attack of Annamalai was unfortunate, but it was not the fault of the BOP or any staff member in the Marion CMU. The United States has proven beyond a reasonable dispute that it is entitled to the benefit of the discretionary function exception, and Annamalai has not carried his burden of proving by a preponderance of the evidence that the United States was negligent. Accordingly, the Court **DIRECTS** the Clerk of Court to enter judgment in favor of the United States and against Annamalai on his FTCA claim. In light of the public trial of this matter, the passage of time, and the transfer of Annamalai to several different institutions during the course of this litigation, the Court **DIRECTS** the Clerk of Court to unseal the Complaint (Doc. 1) and Motion for Emergency Temporary Restraining Order (Doc. 2).

**IT IS SO ORDERED.**
**DATED**: **October 7, 2026**



**J. PHIL GILBERT**
**United States District Judge**